NORRIS, J., delivered the opinion of the court in which GIBBONS, J., joined, and MOORE, J., joined in the result. MOORE, J. (pp. 759-67), delivered a separate opinion concurring in the judgment.
OPINION
ALAN E. NORRIS, Circuit Judge.
Defendant Richard Olive appeals his nine-count conviction for financial crimes *750 committed while he served as President and Executive Director of National Foundation of America (“NFOA”), a corporation organized in Tennessee. Specifically, a jury found him guilty of three counts of mail fraud in violation of 18 U.S.C. § 1341; four counts of wire fraud in violation of 18 U.S.C. § 1343; and two counts of money laundering, 18 U.S.C. § 1957. The district court sentenced him to 372 months of incarceration and three years of supervised release, and ordered him to pay restitution in the amount of $5,992,181.24.
On appeal, he challenges the sufficiency of the indictment, two evidentiary decisions made by the trial court, and three aspects of the sentencing calculation. He also argues that one of the money laundering counts should have been merged with the fraud counts.
I.
Because defendant challenges the sufficiency of the indictment, we begin by summarizing its allegations.

The Indictment

A grand jury returned a nine-count indictment on March 1, 2012. It alleged that defendant used NFOA in a scheme to defraud:
Beginning in or about January 26, 2006 and continuing until in or about May 2007 ... Richard Olive, and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud annuitants and others, and to obtain money or property by means of materially false pretenses, representations, and promises, and by acts of concealment of the scheme, and in furtherance thereof, used the United States mail and interstate wires....
It was ... part of the scheme that Richard Olive, through highly compensated insurance agents across the country, offered and sold investment contracts labeled as NFOA’s “Installment Plan Agreement.” Although Olive and the brokers did not generally refer to these as charitable gift annuities, the NFOA installment plans were marketed as offering similar features and benefits. Potential customers could purchase an installment plan with either cash or by transferring existing annuities, real estate, or securities to NFOA. The vast majority of NFOA’s customers were persons who owned an existing annuity.
The indictment further charged that defendant made other misrepresentations: in February 2006, assets; he stated that NFOA had been recognized as a non-profit charitable foundation pursuant to Section 501(c)(3) of the tax code when, in fact, defendant had merely applied for tax-exempt status, an application that was ultimately denied in February 2008; and, finally, he and the brokers with whom he worked failed to inform customers that NFOA was operating despite cease-and-desist orders issued by several states.
Once customers transferred their annuities to NFOA, defendant would typically surrender them, thereby triggering financial penalties and reducing the value of the annuity. Although defendant guaranteed his customers fixed payments under an NFOA installment plan, the reality was different:
Olive knew that NFOA paid its brokers commissions well above the industry rate, lost a significant portion of the obtained annuities’ value due to their early surrender, and diverted a portion of funds to Olive’s and others’ personal benefit. Because of those costs and the lost value of the annuities, Olive knew that NFOA had far too few assets under its control to guarantee the income in the amounts promised.
*751 ' Having outlined the scheme to defraud, the indictment then detailed the specific instances of mail and wire fraud. With respect to the money laundering counts, the indictment alleged that defendant withdrew $641,051.17 from NFOA on April 4, 2007 in order to purchase a Las Vegas condominium (Count 8) and used NFOA funds to pay an insurance agent $30,028.33 (Count 9).

Trial Testimony

Defendant founded NFOA in January 2006 and applied to the IRS for recognition of its Section 501(c)(3) status the same month. He learned the “business model” from his tenure as a development advisor and executive at National Community Foundation, which offered products similar to those later marketed by NFOA. The company purported to be a charitable organization that supported humanitarian services. As mentioned in the indictment, NFOA encouraged financial advisors[1] to sell its products by offering a 9% commission, which exceeded the industry average.
Two months after its founding, NFOA had three employees: defendant, his wife Susan, and Kenny Marks, who wrote promotional materials for the company, including video scripts. After its first year, it had five employees: Richard and Susan Olive, David Vincent, and defendant’s two stepdaughters, Breanna Galatte and Jeni-lee Vander Elst. Defendant’s wife worked in the office and also did marketing. Van-der Elst served as a receptionist. The company primarily drummed up business through mailings to financial advisors. Gal-latte and Vincent fielded calls from them, explaining the ins and outs of their products. To do so, Vincent and Gallate relied upon a software program and script developed by defendant and his wife. Aceord-ing to Gallatte’s testimony, she and Vincent were told not to deviate from the script when talking to financial advisors. Among the things included in the script was an assertion that NFOA was a tax-exempt Section 501(c)(3) organization. If a financial advisor’s questions went beyond the scope of the script, he or she was referred to defendant.
As discussed earlier, NFOA’s primary business was exchanging a customer’s existing annuity for one of the company’s installment plans, which promised higher returns. Annuities typically have an accumulated value and a surrender value. If surrendered early, the owner receives a substantially lower cash payout. Defendant typically surrendered annuities that it received from customers early. Over the course of its existence, NFOA completed contracts that exchanged client annuities worth approximately $19.3 million and surrendered them for $16.5 million.
On January 17 and March -7, 2007, the IRS contacted NFOA asking for additional information related to its application for Section 501(c)(3) status. The company retained an attorney, David Kamer, who advised defendant that NFOA should not be represented as being a 501(c)(3) enterprise when its application was still pending. Rather, he recommended that the company inform its clients of the situation and note the adverse tax consequences that would attend a denial of 501(c)(3) status. Despite this advice, defendant told others, including financial advisors, that a determination letter was not required for clients to recognize a charitable deduction.
As time passed, NFOA purchased real property with a portion of its assets. These phone tower, an office condominium *752 in Franklin, Tennessee, and a condominium in Las Vegas, Nevada. The last of these transactions forms the basis of a money laundering charge (Count 8). The Las Vegas condominium was purchased for the defendant’s family vacations and to entertain financial advisors. However, it was never used for this purpose because the State of Tennessee took control of NFOA on May 24, 2007, after determining that it was undercapitalized.
At trial, the district court admitted into evidence cease-and-desist orders issued against NFOA by several states, as long as they were in effect during the time period covered by the indictment. Orders were admitted from the states of Washington, Texas, Iowa, Florida, Alabama, Kansas, California, and Michigan. The orders alleged that NFOA was operating illegally because it was not licensed to sell insurance and/or was unlawfully selling securities. They also charged that NFOA incorrectly claimed that it enjoyed tax-exempt status under Section 501(c)(3). Financial advisors testified that knowledge of the orders would have affected their willingness to market NFOA products.
II.
We now turn to the issues raised by defendant,, beginning with the sufficiency of the indictment.

A. Sufficiency of the Indictment

As a general proposition, this court reviews the sufficiency of an indictment de novo. United States v. Gibson, 409 F.3d 325, 331 (6th Cir.2005). Pursuant to Federal Rule of Criminal Procedure 34, the trial court must arrest judgment if the indictment does not charge an offense. Fed.R.Crim.P. 34(a). However, where, as here, “a challenge to an indictment is brought for the first time after the defendant has been convicted, the indictment is ‘construed liberally in favor of its sufficiency.’ ” Gibson, 409 F.3d at 331 (quoting United States v. Gibson, 513 F.2d 978, 979 (6th Cir.1975)); see also United States v. Lloyd, 462 F.3d 510, 513 (6th Cir.2006) (“Where an indictment goes unchallenged until appeal, ... a conviction must not be reversed unless the indictment cannot be reasonably construed to charge a crime.”) (citing United States v. Gatewood, 173 F.3d 983, 986 (6th Cir.1999)). .
Prior to trial, defendant filed a motion styled, “Motion to Dismiss or Strike the False Statements Alleged in Paragraph 9(b), 9(c), and 10 of the Indictment.” The three passages under attack all averred that defendant had falsely represented to annuitants and potential customers, as well as to administrators of existing annuities, that NFOA was a tax-exempt foundation.
The district court noted that “both the introductory and concluding paragraphs [of his motion] indicate that Defendant is moving to dismiss or strike certain language in the Indictment, not the entire Indictment itself.” United States v. Olive, No. 3:12-00048, 2012 WL 4757865, at *1 (M.D.Tenn. Oct. 5, 2012). The court went on to conclude that “even without the challenged language, sufficient factual allegations exist to support the charges of mail fraud, wire fraud, and money laundering, and Defendant makes no argument supporting dismissal of the Indictment.” Id. With respect to the language challenged, the court summarized defendant’s argument, which he renews on appeal, that it was unclear whether merely applying for tax-exempt status was enough to confer such status pending a contrary conclusion on the merits by the IRS. In denying the motion, the district court observed: “Defendant’s premise — that NFOA was, in fact, a charitable organization-may prove to be wrong, and is something for the jury to determine.” Id. at *3.
*753 As he did below, defendant points to authority cited by attorney David Kamer who testified that an opinion letter issued by the General Counsel of the IRS supported defendant’s position that an application for Section 501(c)(3) certification is — at least temporarily — enough to confer tax-exempt status. Kamer testified that he “told [NFOA’s potential clients] that they could take a deduction; but if the IRS issued a determination that it didn’t find the organization to be a 501(c)(3) organization, then they would have to amend the[ir] returns.” In defendant’s view, the ambiguity surrounding the question supported his good faith belief that representing NFOA as a Section 501(c)(3) was legal.
He also directs us to the Tennessee statute governing charitable organizations, which provides in part as follows:
Any organization which has applied for but not received a determination of tax exempt status shall file a copy of the completed application which has been submitted to the internal revenue service, and any letters received from the internal revenue service acknowledging receipt of the application.
Tenn.Code Ann. § 48-101-504(e). In defendant’s view, this provision supports the opinion of the General Counsel of the IRS cited above to the effect that the application temporarily triggers tax-exempt status.
An indictment is sufficient if it contains the elements of the charged offense and thereby informs the defendant of the charges against him. It must also be specific enough to allow him to plead an acquittal or conviction as a bar to future prosecutions for the same offense. United States v. Anderson, 605 F.3d 404, 411 (6th Cir.2010) (citing Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). In this case, wire fraud requires the proof of three elements beyond a reasonable doubt: 1) defendant devised or willfully participated in a scheme to defraud; 2) he used an interstate wire communication to further the scheme; and 3) he intended to deprive someone of money or property. United States v. Cunningham, 679 F.3d 355, 370 (6th Cir.2012) (citation omitted). Mail fraud has essentially the same elements except that the use of the mails rather than a wire is required. United States v. Kennedy, 714 F.3d 951, 958 (6th Cir.2013).
With that in mind, we note that the indictment alleged that defendant made many misrepresentations in addition to his claim that NFOA enjoyed Section 501(c)(3) tax-exempt status. These included the following: he misrepresented to an insurance agent that NFOA had been in business for several years; he provided fraudulent financial statements from 2003 and 2004 despite the fact that NFOA was formed in 2006; he failed to inform clients and financial advisors that NFOA was subject to cease-and-desist orders in several states; and he falsely represented to annuitants that they would receive “a series of guaranteed fixed payments” despite knowing that NFOA “had far too few assets under its control to guarantee the income in the amounts promised.” These allegations led the district court to observe, “[Ijnsofar as Defendant’s motion could be construed as a request for dismissal, the same will be denied because, even without the challenged language, sufficient factual allegations exist to support the charges of mail fraud, wire fraud, and money laundering, and Defendant makes no argument supporting the dismissal of the Indictment.” Olive, 2012 WL 4757865, at *1.
We agree with the district court that the indictment was sufficient. First, defendant did not move to dismiss the indictment for lack of sufficiency at trial and we therefore construe it liberally. Second, it *754 contained several allegations of fraudulent misrepresentations, not simply ones that misrepresented NFOA’s Section 501(c)(3) status. Third, defendant is actually attacking the truth of the indictment’s allegations concerning the Section 501(c)(3) status of NFOA. Such a challenge does not go to the sufficiency of the indictment. Rather, the indictment’s charges put defendant on notice about what he needed to defend against, and enabled him to do just that at trial.

B. Evidentiary Issues

As mentioned at the outset, pursuant to Federal Rule of Evidence 404(b), the district court permitted the introduction of cease-ánd-desist orders issued by several states demanding that NFOA cease selling its installment plans.
We review a district court’s evi-dentiary rulings for an abuse of discretion. United States v. Bell, 516 F.3d 432, 440 (6th Cir.2008). Rule 404(b) permits a district court to admit evidence of other “crimes, wrongs, or other acts” as long as the evidence is offered for a purpose, “such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident,” and not for the mere purpose of proving the defendant’s bad character. See Fed.R.Evid. 404(b)(2). We use the following test when reviewing the admission of 404(b) material:
[W]e employ a three-part test, reviewing (1) for clear error the district court’s determination that the “other act” took place; (2) de novo the district court’s legal determination that the evidence was admissible for a proper purpose; and (3) for abuse of discretion the district court’s determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.
Bell, 516 F.3d at 440 (quoting United States v. Ayoub, 498 F.3d 532, 547 (6th Cir.2007)).
The district court began its discussion by characterizing the orders at issue:
Each Cease and Desist Order contained allegations that NFOA was operating illegally within the state of issuance because it was not licensed to sell insurance and/or was unlawfully selling securities. The Orders also contained allegations that NFOA wrongfully claimed it had charitable exempt status under Section 501(c) of the Internal Revenue Code.
United States v. Olive, No. 3:12-00048, 2012 WL 5866138, at *5 (M.D.Tenn. Nov. 19, 2012). The district court reasoned that the failure by defendant to disclose the existence of such orders “suggests knowledge and intent” on his part. However, the court recognized that the admission of Rule 404(b) material must be balanced with possible prejudice. For that reason, the court limited the admission of the cease-and-desist orders to the following:
The Court will ... allow the Government to present evidence that NFOA and Defendant were issued Cease and Desist Orders that they did not disclose, and which alleged that NFOA was wrongfully claiming that it had received Section 501(c) exempt status. Such evidence will be limited to the Cease and Desist Orders that were issued while Defendant was still operating NFOA, and does not include the Cease and Desist Orders that were issued by Kansas, California and Michigan, after Tennessee took over operation of NFOA.
Id. at *6. However, it precluded the government from using the orders to prove that defendant had violated state securities and insurance laws. Id.
*755 Defendant contends that even the district court’s limited admission of the orders at issue was unduly prejudicial because the state regulatory conclusions concerning NFOA’s 501(c)(3) status were baseless, unduly prejudicial, and caused undue confusion. Specifically, he points out that the IRS issued two requests for additional information to NFOA in support of its application for tax-exempt status while the orders were in effect. It follows, he argues, that because the states issuing the orders had no authority to make a Section 501(c) determination, introducing the orders was unfairly prejudicial because they implied that, in fact, the states had such authority.
For its part, the government directs us to a prior case, United States v. Gold Unlimited, Inc., 177 F.3d 472, 487 (6th Cir.1999), in which we allowed the introduction of cease-and-desist orders a judicial opinion, and a complaint from six states, in total as probative of knowledge, plan, and intent. In that case, defendants had been charged with mail fraud and money laundering in connection with a pyramid scheme. Second, the government observes that the indictment in the present case charged defendant with failure to inform its potential clients and brokers of these orders. At least three brokers testified that they would not have sold NFOA products had they known of these orders, making them relevant and admissible for a proper- purpose. Even if they were not admissible on that basis, they were pursuant to Rule 404(b) because they showed knowledge, intent, and lack of mistake by demonstrating that defendant was on notice that he was misrepresenting NFOA’s tax-exempt status. Third, with respect to defendant’s argument that the orders were misleading because the states issuing them did not have the authority to make a Section 501(c)(3) determination, the government responds that the cease-and-desist orders are probative not because the states had the ability to make the determination whether NFOA received such status, but because they put Olive on notice that he was making this misrepresentation.
In our view, admission of the cease-and-desist orders did not constitute an abuse of discretion. While it is true that the states issuing them lacked the authority to grant Section 501(c)(3) status, they were not admitted for the purpose of proving that NFOA was not tax-exempt. Rather, they were introduced to show that defendant was aware of the fact that tax-exempt status was, at the very least, in doubt. His decision not to divulge them to his prospective clients and financial advisors is probative of his knowledge and intent. As the testimony of three financial advisors during trial indicated, they would have made different business decisions with respect to NFOA had they known about the orders.
A second evidentiary issue raised by defendant involved a charitable donation he and his wife claimed when they filed their joint 2006 tax return. That return included a $25,000 charitable deduction based upon contributions to NFOA. On July 16, 2008, long after NFOA had been taken over by the State of Tennessee, the IRS sent them a letter asking for further information about the gift. They complied by sending, among other things, copies of two checks for $20,000 and $5,000 payable to NFOA as donations. In a letter dated October 6, 2008, the IRS informed the couple that “[w]e are pleased to tell you that we did not make any changes to the tax reported on your return.”
At trial, defense counsel informed the court that he wished to introduce this “no change” letter as evidence that defendant properly thought that donors could take a *756 tax deduction made to entities, such as NFOA, which had filed for Section 501(c)(3) status but had not yet received a determination letter. As counsel put it, “The centerpiece of his defense is that he believed, based on [Section] 508 [of the tax code] and his discussions with the IRS ..., that once the 501(c)(3) application was filed, the tax deductions could be taken even if there was an unfavorable determination.”
In response, the district court asked: “[W]hat do we care what the IRS did in 2008?” Defense counsel continued to urge the court to realize that the IRS, by allowing the deduction, was confirming defendant’s belief and thereby undermining any proof of intent to defraud based upon a misrepresentation of NFOA’s Section 501(c) status. The district court elected not to allow this evidence to be introduced.
Our determination of this issue is governed by our standard of review. While defendant asserts that he honestly believed that he was entitled to a charitable deduction in 2006 and that his instinct was confirmed by the IRS no change letter, it is apparent that the letter did not address the validity of NFOA’s Section 501(c) application and is therefore is of limited evidentiary value. The district court’s decision to exclude it based upon lack of relevance does not amount to an abuse of discretion.

C. Whether One of the Money Laundering Counts Should have Merged

As mentioned at the outset, defendant was convicted of two counts of money laundering in violation of 18 U.S.C. § 1957, which prohibits “knowingly engaging] or attempting] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 ... derived from specified unlawful activity.” 18 U.S.C. § 1957(a). One of these, Count 9, charged him with using criminally derived NFOA funds to pay an insurance agent a commission of $30,028.33. While he did not raise the issue at trial, defendant now contends that United States v. Santos, 553 U.S. 507, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008), precludes this conviction. In Santos-[2] the Court was asked to determine whether “proceeds,” as used in 18 U.S.C. § 1956, refers to “receipts” of a criminal enterprise or to “profits” derived therefrom. Id. at 509, 128 S.Ct. 2020. A plurality concluded that proceeds means profits in the context of 18 U.S.C. § 1956 (and by extension, § 1957, which is at issue in this case)[3]: “Because the ‘profits’ definition of ‘proceeds’ is always more defendant-friendly than the ‘receipts’ definition, the rule of lenity dictates that it should be adopted.” Id. at 514, 128 S.Ct. 2020. In Santos, the defendant was charged with laundering money derived from an illegal lottery scheme. In reaching its conclusion, the plurality explained why the profits definition complied more nearly with the rule of lenity:
If “proceeds” meant “receipts,” nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. *757 § 1955, would “merge” with the money-laundering statute....
The merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime.... Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering....
... Interpreting “proceeds” to mean “profits” eliminates the merger problem.
Id. at 515-17, 128 S.Ct. 2020.
This circuit has addressed the holding of Santos on several occasions. See, e.g., Kratt, 579 F.3d at 560-63; United States v. Crosgrove, 637 F.3d 646, 654-55 (6th Cir.2011); Jamieson v. United States, 692 F.3d 435, 439-40 (6th Cir.2012). As Justice Scalia recognized, his plurality opinion is limited by the narrower reasoning of Justice Stevens’ concurrence, which supplied the critical fifth vote. Santos, 553 U.S. at 523, 128 S.Ct. 2020. While this court has struggled to parse the precise holding of Santos, see Kratt, 579 F.3d at 562, we have construed it to implicate three considerations:
(1) is there a merger problem; (2) does this problem lead to a radical increase in the statutory maximum sentence; and (3) does the legislative history fail to show that Congress intended the increase? If the answer to all three questions is yes, “proceeds” means “profits.” If the answer to any question is no, then “proceeds” means “gross receipts.” See United States v. Crosgrove, 637 F.3d 646, 654-56 (6th Cir.2011) (explaining and applying the “Santos-Kratt framework”).
Jamieson, 692 F.3d at 440 (emphasis origi- . nal). With these steps in mind, we turn to each of them.
Is there a merger problem? We conclude that there was. The mail fraud counts of the indictment charge that defendant “through highly compensated insurance agents across the country, offered and sold investment contracts labeled as NFOA’s ‘Installment Plan Agreement.’ ” The money laundering count at issue charges defendant with “the transfer and withdrawal of funds by the means set forth below, such property having been derived from a specified unlawful activity, namely, mail fraud.” While the government argues that money laundering occurred after the completion of the mail fraud offense, the criminal acts charged in the indictment lead us to an opposite conclusion: the mail fraud included compensating “insurance agents across the country.” NFOA made (or lost) money by inducing insurance agents to purchase installment plans. And, “[a]n individual cannot be convicted of money laundering for paying the ‘essential expenses of operating’ the underlying crime.” United States v. Halstead, 634 F.3d 270, 279 (4th Cir.2011) (quoting Santos, 553 U.S. at 528, 128 S.Ct. 2020 (Stevens, J., concurring)). We therefore conclude that there is a “merger problem” in this case.
However, even though we conclude that a merger problem exists, defendant must also be exposed “to a markedly increased statutory maximum.” Kratt, 579 F.3d at 563. In this case, the statutory maximum sentence for mail fraud, 18 U.S.C. § 1341, is twenty years’ while the maximum for money laundering under 18 U.S.C. § 1957 is ten. In Kratt, the money laundering offense carried a lesser penalty than the predicate offense, and that factor ended the inquiry. Is the instant case distinguishable? We note that the district court *758 imposed consecutive sentences totaling 31 years .of imprisonment, certainly above the statutory maximum of both the mail fraud and money laundering statutes (but below the Guidelines range of 106 years’). Should the fact that the sentences were to run consecutively matter as long as the predicate offense of the merged counts carries a greater statutory maximum? We think not. While defendant has received a very lengthy sentence, the additional five years occasioned by the money laundering conviction at issue does not implicate the rationale of Santos or our cases construing it, to wit, that a money laundering conviction which embraces the same criminal behavior as the predicate offense must also raise the statutory maximum sentence for defendant to win relief. Given that the Santos inquiry is one of statutory construction, it makes little sense to hinge the meaning of “proceeds” on a discretionary post-conviction sentencing decision. Both the court and the parties are entitled to know its definition with certainty throughout the proceedings because the definition will affect charging decisions, plea negotiations, trial strategy, and jury instructions.
Finally, because we deny defendant relief on the second factor, “there is no reason to consider whether the legislative history shows that Congress contemplated, .and intended, any such outcome.” Kratt, 579 F.3d at 563.

D. Sentencing Issues

Defendant objects to three sentencing decisions: the amount of loss calculation; his role in the offense; and the “vulnerable victim” enhancement. The 2012 version of the Sentencing Guidelines was used in this case.

1. Amount of Loss Calculation

Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), the presentence report (“PSR”) recommended that defendant’s base offense level be increased by 22 because the amount of loss was between $20 and $50 million. The district court disagreed and fixed the amount of loss at more than $2.5 million but less than $7 million, for an enhancement of 18. See U.S.S.G. § 2B1.1(b)(1)(J). Despite the more favorable calculation, defendant objects because the district court failed to provide sufficient rationale for its decision. At the sentencing hearing, the court gave this explanation:
Based on the evidence, I think that it’s J that applies. It’s greater than 2.5 million. I think the evidence was more than sufficient for the application of that loss amount. And so there is an 18 point enhancement.
Counsel failed to object or ask for clarification and hence our review is for plain error. United States v. Vonner, 516 F.3d 382, 385-86 (6th Cir.2008) (en banc).
The district court “need only make a reasonable estimate of the loss.” U.S.S.G. § 2B1.1 cmt. n. 3(C). That determination is entitled to “appropriate deference.” Id. We note that the district court ordered restitution in the amount of $5,992,181.24, which was less than the amount sought by the government. Given that figure, we may infer that the court used it to determine the Guidelines’ loss amount as well. Of course, more explanation would have been helpful but, in the light of our plain error review, we affirm the district court on this point.

2. Role in the Offense

The district court enhanced defendant’s offense level by four because it concluded that he “was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.” U.S.S.G. § 3B1.1(a). The court observed, “No question he was the leader of *759 this criminal activity, such that the four-level enhancement applied.” We review the factual findings of the district court on this issue for clear error and accord deference to the legal conclusion that a person is an organizer or leader under Section 3B1.1. United States v. Washington, 715 F.3d 975, 982-83 (6th Cir.2013).
An application note to the guideline at issue provides as follows:
In assessing whether an organization is “otherwise extensive,” all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.
U.S.S.G. § 3B1.1, cmt. n. 3. If the district court finds that the defendant directed someone else and the scheme to defraud was otherwise extensive, then it can apply the enhancement without singling out five individuals. See United States v. Anthony, 280 F.3d 694, 699 (6th Cir.2002) (explaining that “if the offense involved fewer than five participants the ‘otherwise extensive’ language on which the sentencing court may base its decision to depart upward”, provided “the offense, in question is somehow the functional equivalent of a crime involving five or more participants.”) In this case, the scheme was quite extensive inasmuch as it involved the “unknowing services of many outsiders”: the many financial advisors who supplied “clients” for defendant to defraud. We affirm on this basis.

3. Vulnerable Victims

The Guidelines call for a two-level enhancement if the “defendant knew or should have known that a victim of the offense was a vulnerable victim.” U.S.S.G. § 3A1.1(b)(1). A vulnerable victim is someone who “is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.” U.S.S.G. § 3A1.1, cmt. n. 2. The PSR recommended the enhancement because most of the annuitant victims were elderly with an average age of 77. The district court did not offer much further explanation, observing only that, “[Defendant knew or should have known that the victims of the offense were vulnerable, more than sufficient evidence of that.”
Defense counsel argues that the financial advisors were the ones who selected the clients, not defendant, and that they were sophisticated people of means because they employed financial advisors in the first place. Given the age of the victims, the fact that no financial advisor was charged with malfeasance, and our standard of review, we affirm this enhancement.
III.
The judgment of the ‘district court is affirmed.

. The briefs and record refer to brokers, insurance agents, and financial advisors interchangeably.

. Although decided after the scheme to defraud in this case occurred, we have held that Santos applies retroactively. Wooten v. Cauley, 677 F.3d 303, 308-09 (6th Cir.2012).

. We have specifically held that "proceeds” has the same meaning in §§ 1956 and 1957. United States v. Kratt, 579 F.3d 558, 560-61 (6th Cir.2009); see also 18 U.S.C. § 1957(f)(3).