NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0559n.06

Nos. 15-5968, 15-5970, 15-6260

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 04, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| MARY PATRICIA CURETON, ROBERT | ) | STATES DISTRICT COURT FOR THE |
| SCOTT SHEPPARD, and TONY G. | ) | EASTERN DISTRICT OF KENTUCKY |
| PETREY, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE:     DAUGHTREY, GIBBONS, and COOK, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Information "that there was a lot of activity" at an abandoned Whitley County (Kentucky) trailer led to the uncovering of a multi-defendant, interstate, drug-trafficking conspiracy and to the convictions of defendants Mary Cureton, Robert Sheppard, and Tony Petrey. On appeal, the three defendants raise challenges to the reasonableness of the prison sentences imposed upon them. Additionally, Cureton argues that the prosecution failed to adduce sufficient evidence to support her conviction for conspiracy to distribute methamphetamine, that the district court erred in certain evidentiary determinations, that the district court gave an unnecessary jury instruction, and that the cumulative effect of the alleged errors deprived her of due process of law. We find no reversible error and affirm the judgments against all three defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 19, 2014, Sergeant Tony Dingess of the Kentucky State Police received information regarding activity at an abandoned trailer that law enforcement officials associated with numerous drug-related incidents, despite the fact that the trailer had neither running water nor working electricity. Dingess, other officers, and Wayne Bird, the chief of the Williamsburg Police Department, knocked on the door of the trailer and asked Tony Petrey, the person who answered the knock, whether they "could step in and speak with him." After Petrey allowed the officers to enter, he admitted that his girlfriend, Mary Cureton, was in the back bedroom of the trailer and that he had drugs in one of his shirt pockets.

During the subsequent search of Petrey's person and of the trailer, the police recovered five Xanax pills, a bag of crystal methamphetamine, three rocks of black tar heroin, a separate baggie of black tar heroin, digital scales, four Suboxone strips, and $2,416 in cash. As a result, Petrey was placed under arrest, and Cureton also was taken to the police station where she was arrested after a warrant check indicated that she was wanted on an outstanding failure-to-appear warrant. After arresting Cureton, a deputy jailer searched her belongings and found in her purse a baggie containing a crystalline substance that later tested positive for high-quality methamphetamine.

At the police station, both Cureton and Petrey indicated a willingness to speak with law enforcement officials. In her initial statement on February 20, 2014, Cureton explained to Trooper Les Moses of the Kentucky State Police that, prior to meeting Petrey, she had not used methamphetamine for seven or eight years. Approximately two weeks after meeting Petrey, however, she relapsed into her methamphetamine habit and even began using heroin in the last

week before her arrest. She nevertheless was adamant that, during the six weeks or so that she and Petrey were together, Petrey never sold any illegal drugs in her presence nor was she aware of how Petrey came into possession of the narcotics found on his person and in the trailer.

Four days later, on February 24, 2014, Cureton's attorney approached Moses and Dingess and stated that his client wished to speak again with the law enforcement officers. In a second recorded interview, Cureton changed many aspects of her prior statement, leading Dingess to conclude that she had "much detailed knowledge about the inner workings of Tony Petrey's operation." Specifically, she detailed how Petrey obtained the drugs that he then sold to other individuals. According to Cureton, she would accompany Petrey to Walmart stores where Petrey would purchase MoneyGrams in $1000 amounts. Even though Cureton had in her possession a receipt for such a purchase on February 11, 2014, she denied that she ever sent the MoneyGrams herself. Instead, she said, Petrey would wire the money to a California resident that Cureton knew only as "Quick." Upon receipt of the MoneyGram, Quick then would mail Petrey a package containing methamphetamine that Petrey would sell to various buyers in Kentucky.

Contrary to her earlier statement to Trooper Moses, Cureton also admitted during the second taped conversation that she indeed had seen Petrey selling methamphetamine on occasion. Furthermore, at Petrey's request, Cureton once waited at an address for delivery of Quick's package. However, before the mail delivery occurred, Petrey returned from an errand he had been running, relieving Cureton of the responsibility of retrieving the package from the designated mailbox.

Cureton offered that Petrey received shipments of methamphetamine from Quick once a week, but that in the week prior to being arrested, Petrey had wired extra money to Quick in

order to receive a shipment of heroin from California in addition to the usual methamphetamine delivery. Petrey intended to continue receiving both drugs from Quick but needed more cash to pay for the shipments. Consequently, Cureton loaned Petrey $180 to help pay for the MoneyGram to cover the increased cost of the drug purchase.

For his part, Petrey provided substantial assistance in obtaining evidence against defendant Larry Gutierrez, the person also known as Quick. After agreeing to cooperate with authorities, Petrey made several recorded phone calls to Gutierrez in California arranging a shipment through the U.S. mail of methamphetamine from California to Kentucky. The shipment then was intercepted by the postal service and determined to contain somewhat less than 30 grams of methamphetamine.

Additionally, Petrey provided evidence of Cureton's involvement in the drug-trafficking conspiracy, even though he testified at Cureton's trial that he "never considered Mary to be a part of the organization or to have a part in the drug crime." He explained that he met Gutierrez when the two men were serving time in prison. Once released from custody, Petrey contacted Gutierrez and would wire him money in exchange for packages of drugs sent in priority mail packages. Cureton went with Petrey "[e]very time" he picked up the packages from Gutierrez, knowing full well what the packages contained. Indeed, according to Petrey, Cureton "was with [him] the whole time, whenever [he] dropped off dope or picked up money." Moreover, he alleged, she loaned him money to purchase drugs, helped him count bags of methamphetamine that he had repackaged for sale, oftentimes to David Powers and Jessie Mays, and she herself once sold a bag of methamphetamine to one of her friends for $50.

No doubt in part because of Petrey's identification of David Powers as a regular buyer of high-quality methamphetamine, and also because of the receipt of information that Robert Sheppard, a wanted fugitive, was staying with Powers, officers visited Powers's residence, knocked on his door, and obtained consent to search the home. While at least one officer stayed upstairs with Powers, others located Sheppard hiding in the basement, near two loaded firearms. Sheppard, a convicted felon, was taken into custody, and a few days later, acknowledged his role in the December 2012 shooting of an individual named Johnny Hill. According to Sheppard's account, "both the Hill boys, Melvin Hill and Johnny Hill, . . . [were] trying to rob him. He was at home. He heard some people prowling around outside. He yelled out to 'em. There was no response. . . . [H]e shot when he didn't get a reply."

Not surprisingly, Johnny Hill gave a slightly different account of the incident that resulted in Sheppard shooting him in the back. Hill told the police:

> [H]e had been staying at the residence with Mr. Sheppard and another female. He advised that that night he and Sheppard were there by their selves [sic], that they did hear someone in the woods.
>
> Sheppard grabbed the .22 rifle. Hill stated that he grabbed a spotlight, and that he went into the woods looking for the individuals that they heard.. . . . .
>
> Johnny Hill stated that when he was on his return to the residence, he said that he could see Mr. Sheppard on the front porch. He said Sheppard then turned and fired in his direction striking him.

As a result of the information obtained by the various law enforcement agencies, the federal grand jury charged Cureton, Sheppard, and Petrey, as well as Gutierrez, Powers, and Mays, in various counts of a six-count indictment. Sheppard pleaded guilty to two counts of being a felon in possession of a firearm—one count involving the shooting of Johnny Hill and the other involving his constructive possession of the firearms found in David Powers's home—

and was sentenced to an effective prison term of 162 months, to run consecutively to any incarceration imposed in the related state prosecution. Petrey also pleaded guilty to two counts of the indictment—one charging him with conspiracy to distribute methamphetamine and one charging him aiding and abetting the use of the U.S. mail to commit a felony. The district court imposed upon Petrey an effective sentence of 200 months in prison, again to be served consecutively to any state sentence imposed in connection with the same activities.

Cureton, however, chose to go to trial on the charge against her. Although the jury in her initial trial could not reach a verdict, a new jury in the retrial found Cureton guilty of conspiring to distribute methamphetamine. Then, at sentencing, the district court imposed upon her a 90-month prison sentence to run consecutively to any sentence imposed by the state court in conjunction with the same illegal activity.

The convictions and sentences of co-conspirators Gutierrez, Powers, and Mays are not before this panel. Cureton, Sheppard, and Petrey, however, appeal various aspects of their convictions and/or sentences. We examine each allegation of error in turn.

## DISCUSSION

**Allegations of Error Raised by Defendant Cureton**

### Sufficiency of the Evidence

In her first appellate issue, defendant Cureton argues that the prosecution failed to adduce sufficient evidence to establish her guilt of the charged conspiracy beyond a reasonable doubt. When challenging the legal sufficiency of the evidence to support a guilty verdict, a defendant bears a "heavy burden." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir.), *cert. denied*,

135 S. Ct. 196 (2014) (citation omitted). In fact, when reviewing such a challenge, we ask simply "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Moreover, when engaged in such a review, "[w]e do not insert our own findings of fact; rather we give full credit to the responsibility of the jury to weigh the evidence, to make credibility determinations, and to draw inferences." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (citing *Jackson*, 443 U.S. at 319).

In order to prove a drug conspiracy, the prosecution must show "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006) (internal quotation marks and citations omitted). The agreement, however, need not be formal or express, and the "evidence linking an individual defendant to that conspiracy need only be slight." *Id.* at 233.

In advancing her argument on this issue, Cureton seeks to highlight snippets of trial testimony that downplay her role in any drug-trafficking operation. For instance, she contends that Petrey did not consider her to be a part of his criminal organization, that the police initially did not identify her as a drug trafficker, that her name did not appear on any of the MoneyGram receipts, and that the police possessed no audio or video evidence of her participation in any of Petrey's drug sales to other individuals. In short, she submits that the government established only her mere association with Petrey, proof that we have held to be insufficient to support a conspiracy conviction absent other evidence of participation in the alleged wrongdoing. *See United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003).

Cureton's argument in this regard fails to take into account countervailing testimony that was credited by the jury. For example, Petrey testified at trial that Cureton had accompanied him on drug sales and on trips to purchase MoneyGrams to secure the delivery of additional drugs, with full knowledge of the purpose of those activities. She also agreed to watch for delivery of a drug shipment while Petrey was running another errand and even loaned Petrey $180 to cover a shortfall in the purchase price for methamphetamine and heroin from Gutierrez. Furthermore, Petrey claimed that Cureton helped him count bags of methamphetamine for sale and actually sold one such bag to a friend of hers.

"Testimony by co-conspirators alone can be sufficient to prove the existence of a conspiracy." *Id.* However, in this case, tape-recorded statements heard by the jury included Cureton's own admissions that she knew what the money wired to Gutierrez was meant to purchase, that methamphetamine and heroin were delivered through the mail to Petrey, that she observed Petrey making drug sales to other individuals, and that she loaned Petrey money to purchase more illegal drugs. This combination of Petrey's testimony and Cureton's own admissions on tape is more than sufficient to establish Cureton's knowledge of, and agreement to participate in, the drug-trafficking conspiracy. The challenge to the sufficiency of the convicting evidence thus is without merit.

#### Testimony Regarding the Use and Distribution of Heroin

During the course of Cureton's trial, the jurors heard testimony both that Cureton began using heroin in the week or so before her arrest and that Petrey began receiving and selling heroin, along with methamphetamine, in that same timeframe. Because Cureton was not charged with any heroin-related offense, she now claims that the introduction of such testimony at trial

was both prejudicial and tantamount to an improper reference to other crimes, in violation of the proscriptions of Federal Rule of Evidence 404(b).

We generally review a district court's evidentiary rulings for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *United States v. Olive*, 804 F.3d 747, 754 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 2511 (2016). "[R]eversal is appropriate only if the abuse of discretion was not harmless error, that is, only if the erroneous evidentiary ruling affected the outcome of the trial." *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) (quotation marks and alterations omitted). Cureton has failed to convince us that any such error occurred in this regard.

Cureton correctly notes that Rule 404(b)(1) explicitly prohibits the introduction of evidence of a crime, wrong, or other act if that evidence seeks "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Before evidence of such other crimes, wrongs, or bad acts may be introduced, a district court must assure itself that the other act did, in fact, occur; that the challenged evidence is being offered for a proper purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"; and that the probative value of the evidence is not outweighed by it prejudicial effect. *See* Fed. R. Evid. 404(b)(2); *Olive*, 804 F.3d at 754.

Here, the district court did not engage in the multi-step Rule 404(b) analysis. Instead, the district court determined that the references to Petrey's purchase and sale of heroin and to Cureton's use of that scheduled drug were admissible as *res gestae* or as intrinsic or background evidence. "*Res gestae*" or "intrinsic acts" "are those that are inextricably intertwined with the

criminal act charged or a part of the criminal activity as opposed to extrinsic acts, which are those that occurred at different times and under different circumstances from the offense charged." *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) (citation omitted). Clearly, Petrey's purchase and sale of heroin and Cureton's experimentation with the drug are facts that "ar[ose] from the same events as the charged offense." *Id.* (citation omitted). The testimonial references to such acts merely completed the story of the offenses charged in the indictment and were not calculated to prejudice Cureton by raising the specter of her guilt of other crimes.

Although the better practice would have counseled against any mention of heroin use or trafficking, the defense in no way was compromised by the few passing references to heroin that was purchased shortly before Petrey and Cureton were arrested. Furthermore, when instructing the jury, the district court twice admonished the finders of fact that consideration of possible crimes not included in the indictment was forbidden. First, the court stated, "I want to emphasize that the defendant is only on trial for the particular crime charged in the indictment. Your job is limited to deciding whether the government has proven the crime charged." Later, the court reiterated, "Remember that the defendant is only on trial for the particular crime charged in the indictment. Your job is limited to deciding whether the government has proved the crime charged."

Absent extraordinary situations, "we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985); *see also United States v. Lawrence*, 735 F.3d 385, 403 (6th Cir. 2013), *cert. denied*, 135 S. Ct. 753 (2014). Cureton has failed to offer any evidence that would rebut that presumption. Consequently, we conclude that the district court did not abuse its discretion in terming testimony concerning Cureton and Petrey's heroin use and trafficking *res*

*gestae* and allowing mention of those facts when relating the circumstances surrounding Cureton's arrest and the investigation into her complicity in the conspiracy to distribute methamphetamine.

## **Jury Instructions**

Cureton next submits that the district court erred in offering, *sua sponte*, a jury instruction that was not contained in the Sixth Circuit Pattern Jury Instructions, and by refusing to give another instruction specially requested by the defense. Neither allegation of error has merit.

Throughout the trial, defense counsel appropriately sought to downplay Cureton's role in the methamphetamine-distribution conspiracy. Counsel elicited testimony that Cureton did not have any personal contact with Gutierrez, that she personally did not purchase the MoneyGrams sent to California, and that she did not conduct any sales of illegal drugs other than the single $50 transaction with a friend of hers. Moreover, during closing argument, defense counsel repeated those points and stated to the jury:

> We know from the fact of her own statements, which have been corroborated by the evidence – no MoneyGrams, no evidence of drug sales, no discussion of her statements to the police – that when Tony Petrey tried to get her to do these things, she refused to do so. Ladies and gentlemen, that's evidence of a lack of an agreement, not evidence of an agreement.

In light of defense counsel's effort to minimize the actions Cureton took in furtherance of the alleged conspiracy, all the while glossing over evidence of her knowledge of its inner workings, the district court decided to instruct the jury that a defendant need not take an overt act in furtherance of the conspiracy in order to be found guilty of the charge. As the district court explained to defense counsel:

> And ordinarily, had you not attempted to argue and confuse the jury that [proof of an overt act] was required, I wouldn't necessarily be giving it. But I think that's been attempted in the case, and I think to avoid any jury confusion, it is necessary under the circumstances, although not included in the pattern instruction.

The district court instructed the jury that "the government is not required to prove that the defendant took any overt action in furtherance of the conspiracy. While commission of some of the overt acts may be evidence that the defendant knowingly and voluntarily joined the conspiracy, such proof is not required."

"A district court enjoys broad discretion 'in crafting jury instructions and does not abuse its discretion unless the jury charge fails accurately to reflect the law.'" *United States v. Maslenjak*, 821 F.3d 675, 681 (6th Cir. 2016), *petition for cert. filed* (U.S. Sept. 8, 2016) (No. 16-309) (quoting *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). Consequently, "[a]n improper jury instruction requires reversal only where the instructions, when viewed as a whole, are found to be confusing, misleading, or prejudicial." *Id.* at 681-82 (internal quotation marks and citation omitted).

The jury instruction given by the district court in this case unquestionably is an accurate statement of the law. Indeed, the United States Supreme Court has made clear that "21 U.S.C. § 846, the drug conspiracy statute, [does not] require[] the Government to prove that a conspirator committed an overt act in furtherance of the conspiracy." *United States v. Shabani*, 513 U.S. 10, 11 (1994). Nor was the clearly worded instruction given by the district court confusing or misleading. In any event, the evidence before the jury clearly indicated that Cureton did indeed take overt steps in furtherance of the conspiracy. Even though she did not physically retrieve the packages of drugs shipped through the mail to Petrey by Gutierrez, she did keep watch for such deliveries, she did accompany Petrey when he purchased the

MoneyGrams and sold the illegal drugs, and she did provide Petrey with money to purchase additional drugs for resale. Under these circumstances, the additional jury instruction given by the district court cannot be deemed either confusing, misleading, or prejudicial.

Cureton contends, however, that the mere offering of the overt-act instruction "create[d] an appearance of judicial bias towards the prosecution." Cureton's Br. at 36. To support that assertion, she cites our decision in *United States v. Slone*, 833 F.2d 595 (6th Cir. 1987), for the proposition that a trial judge must "always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury." *Id.* at 597 (internal quotation marks and citations omitted).

In *Slone*, however, the trial judge "interjected himself into the record and took over the examination of witnesses" before the jury. *Id.* at 598. By contrast, the district judge in this case explained his reasons for offering an additional jury instruction outside the presence of the finders of fact. Moreover, although it is possible that other jurists might not have deemed it necessary to clarify further the charge on the crime of conspiracy to distribute drugs set forth in the pattern instructions, the district judge's desire here to ensure that the jurors were not confused about the requirements necessary to convict a defendant clearly did not amount to an abuse of the court's broad discretion.

Nor did the district court err in refusing to give the special jury instruction requested by Cureton. "A refusal to give requested instructions is reversible error only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993). "It is of course well

established that an instruction should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation." *United States v. James*, 819 F.2d 674, 675 (6th Cir. 1987) (citations omitted).

Cureton requested the district court to charge the jury that a simple buyer-seller relationship alone is insufficient to tie an individual to a conspiracy. However, as defense counsel admitted upon questioning from the district judge, the record contains no evidence of a buyer-seller relationship between Cureton and any other member of the conspiracy. Although Cureton was aware of Petrey's plans and accompanied him both to purchase MoneyGrams and to sell the drugs he received in return for those payments, she herself neither bought nor sold the drugs. The only drug sale she herself initiated was with a personal friend who was not tied in any way to the wider conspiracy. Thus, the buyer-seller instruction requested by Cureton "should not have been given because there was absolutely no evidence in the record to support its applicability." *United States v. Bryant*, 716 F.2d 1091, 1094 (6th Cir. 1983).

### Limits on Defense Counsel's Cross-Examination

Nor did the district court commit reversible error in restricting certain cross-examination of a prosecution witness. When questioning Police Chief Bird about the statement given to authorities by Petrey, defense counsel asked whether Petrey, in his statement, had implicated Cureton in the criminal conspiracy. After Bird responded, "Not initially, no, sir," counsel prepared to ask Bird whether co-conspirator David Powers or any other co-conspirator mentioned Cureton in their statements to the police. The district judge sustained the government's objection to that question, ruling, "No, that's hearsay. You cannot get into that."

Even if the district court's ruling could be considered erroneous, any such error clearly was harmless. First, any answer that counsel could have received from Bird regarding the lack of mention by Powers or any other co-conspirator of Cureton's role in the conspiracy would have been cumulative. Bird already had testified that Petrey, the individual most knowledgeable about Cureton's role, had not mentioned the defendant in his statement to police. Second, the failure of Powers or anyone else to state that Cureton was a member of the conspiracy was irrelevant to the question of the defendant's guilt because every member of the conspiracy need "not know the identities of every other member" and need not be "involved in all the activities in furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 333 (6th Cir. 2005). Thus, this issue also is without merit.

### Claim of Cumulative Error

Cureton next argues that even if no single allegation of error should lead to reversal of her conviction, the cumulative effect of otherwise harmless errors rendered her trial "fundamentally unfair in violation of due process." *United States v. Blackwell*, 459 F.3d 739, 770 (6th Cir. 2006). However, as discussed in conjunction with Cureton's other arguments on appeal, the evidence adduced by the prosecution was sufficient to support Cureton's conspiracy conviction, and the district court's trial rulings were not so egregious, either individually or cumulatively, as to deprive Cureton of a fair trial.

### Reasonableness of Cureton's Sentence

In her final issue on appeal, Cureton challenges the appropriateness of her 90-month prison sentence. She argues that the district court relied upon an improper presentence investigation report in calculating her Guidelines range and that she should have been deemed a

minimal participant, rather than a minor participant, in the conspiracy. She further alleges that when formulating her sentence, the district court failed to give due consideration to the abuse she suffered as a child and erred in basing the sentence on the fact that "actual" methamphetamine was distributed in furtherance of the conspiracy without any expert testimony to establish the purity of the drug.

We review a district court's imposition of a sentence for reasonableness, employing a deferential abuse-of-discretion standard. *See Gall v. United States*, 552 U.S. 38, 41 (2007); *United States v. Pearce*, 531 F.3d 374, 384 (6th Cir. 2008). Such a reasonableness review "has both a procedural and a substantive component." *United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008) (citing *Gall*, 552 U.S. at 51). Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. A review for substantive reasonableness "will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008). Furthermore, "we may apply a rebuttable presumption of reasonableness to sentences within the Guidelines," *Pearce*, 531 F.3d at 384, and may not reverse a district court's sentencing determination simply because we "might reasonably have concluded that a different sentence was appropriate." *Gall*, 552 U.S. at 51.

Cureton's first challenge to her sentence can be resolved quickly. Prior to sentencing, Cureton's lawyer received from the U.S. Probation Office a presentence investigation report dated July 17, 2015, which calculated a Guidelines base offense level of 12 and recommended a two-level reduction for the defendant's minor role in the offense. Consequently, the report recommended that Cureton be sentenced within the range of 8 to 14 months. The following day, a second presentence investigation report was issued, setting the defendant's base offense level at 30, prior to the two-level reduction for a minor role in the offense. Under that second calculation, Cureton was subject to a Guidelines sentencing range of 87 to 108 months.

Not surprisingly, Cureton argues that the initial report should be used to determine her appropriate sentence. However, the Probation Office explained that the initial "report was never intended for disclosure to the parties" and "was inadvertently disclosed with the incorrect guideline calculation." The fact that an initial, incorrect draft of the presentence report was forwarded to the defendant in error does not vest Cureton with a right to have that erroneous report serve as the basis for the district court's investigation into her background.

Moreover, the evidence before the district court justified assigning an initial base offense level of 30 to Cureton. Even discounting Cureton's involvement in Petrey's purchases of heroin, a conservative estimate of Cureton's involvement in the drug-trafficking establishes that she loaned Petrey money for the purchase of at least one ounce of methamphetamine and agreed to serve as a lookout for a mail delivery of another ounce. Those two ounces alone, equal to 56 grams of the substance, would place Cureton in base offense level 30 if the methamphetamine were considered to be "actual" methamphetamine or "ice." USSG § 2D1.1(c)(5). Although Cureton is correct that the government introduced no scientific proof regarding the purity of the methamphetamine purchased and later distributed by Petrey, Cureton herself referred to the drug

as "ice," saying "that was real ice . . . the real stuff, the good stuff." And Petrey admitted in his plea agreement that the shipments he received from Gutierrez contained, in addition to heroin, "crystal methamphetamine." Furthermore, field tests confirmed the methamphetamine's quality.

"A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). Furthermore, "[t]he district court's decision as to the amount of drugs for which [the defendant] is responsible must stand unless it is clearly erroneous." *United States v. Ward*, 68 F.3d 146, 149 (6th Cir. 1995). Because the district court relied upon Cureton and Petrey's own admissions regarding the purity of the product they were distributing, because the district court used a conservative estimate in calculating the drug amount for which Cureton was responsible, and because that calculation was not clearly erroneous, the district court did not err in assigning Cureton an initial base offense level of 30 for her participation in the purchase, receipt, or distribution of only two ounces of "ice."

Nor did the district court err in rejecting Cureton's claim that she was a "minimal," rather than a "minor," participant in the conspiracy. As a minor participant, defined as a defendant "who is less culpable than most other participants, but whose role could not be described as minimal," USSG § 3B1.2, comment. (n.5), Cureton received a two-level reduction from her base offense level of 30. Had she been deemed a minimal participant in the drug-trafficking conspiracy, she would have been entitled to a four-level decrease in her base offense level, USSG § 3B1.2(a), resulting in a Guidelines sentencing range of 70 to 87 months, rather than the range of 87 to 108 months calculated by the district court.

"Whether a defendant is entitled to a downward departure under § 3B1.2 depends heavily on factual determinations, which we review only for clear error." *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir. 2002). The district court did not commit such clear error in not terming Cureton a minimal participant. Application Note 4 of the commentary to USSG § 3B1.2 explains:

> Subsection (a) applies to a defendant . . . who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the *defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant*.

USSG § 3B1.2, comment. (n.4) (emphasis added). Although Cureton clearly was one of the least culpable members of the interstate conspiracy, she had full knowledge of Petrey's pivotal role in the process and willingly accompanied and assisted him in many of his activities related to the conspiracy once she and Petrey became romantically involved. Even though we might have cast a more forgiving eye on Cureton's role in the conspiracy, in light of the Guidelines description of "minimal participants," we cannot say the district court committed clear error in concluding otherwise.

Finally, Cureton argues that the district court should have granted her a downward departure from her applicable sentencing range due to her history of drug addiction, her agoraphobia, her post-traumatic stress disorder, her previous suicide attempts, her medical history, and her past history of childhood abuse. However, even her own attorney conceded at the sentencing hearing "that those are factors more to be taken into account as to a sentence with where it should fall within the guideline range," rather than whether the defendant is entitled to a downward departure from an otherwise proper sentencing-range determination. In any event, the

district court did consider the relevant factors set forth in 18 U.S.C. § 3553(a) and noted, "The Court is very sympathetic of individuals that do present backgrounds that are similar to Ms. Cureton's background, but in my opinion, [such a background] doesn't give rise to a lesser sentence."

In short, the district court considered the relevant factors set forth by statute before determining the appropriate sentence to be imposed upon Cureton. Although Cureton continues to advocate for a more lenient punishment, she has adduced no evidence that would rebut the presumption that her sentence at the lower end of the applicable Guidelines range is substantively reasonable. *See, e.g.*, *Pearce*, 531 F.3d at 384.

**Allegations of Error Raised by Defendant Sheppard**

### Reasonableness of Sheppard's Sentence

Defendant Sheppard also contends that the sentence imposed upon him is both procedurally and substantively unreasonable. He first alleges that the district court unreasonably added four points to his base offense level pursuant to the provisions of USSG § 2K2.1(b)(6)(B) for use of a firearm "in connection with another felony offense," specifically, the December 22, 2012, shooting of Johnny Hill. According to Sheppard, the district court should not have used that prior shooting as a basis for increasing his offense level in the present case because he was protecting his home and its occupants at that time under Kentucky's "stand-your-ground" statute and because the testimony providing evidence of his participation in that 2012 shooting was unreliable hearsay.

Both of these challenges to the procedural reasonableness of Sheppard's sentence are without merit. Sheppard does not dispute that the district court added four levels to his base offense level because he used a firearm on December 22, 2012, in such a way as to constitute assault in the second degree. He also does not contest the fact that Kentucky Revised Statute § 508.020(1)(b) provides that "[a] person is guilty of assault in the second degree when . . . [h]e intentionally causes physical injury to another person by means of a deadly weapon or a dangerous instrument." However, Sheppard does claim that he cannot be found to have committed such an assault because, when he shot Hill, he was standing his ground, as allowed by the provisions of Kentucky Revised Statute § 503.055. Pursuant to the pertinent provision of that statute, a person may use even deadly force against another individual if "[t]he person against whom the defensive force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered a dwelling, residence, or occupied vehicle." Ky. Rev. Stat. § 503.055(1)(a). Of course, even Sheppard's account of the December 2012 shooting does not place Hill within or attempting to enter Sheppard's home or vehicle. Instead, all persons involved in the incident agree that Hill was shot *in the back* and *outside of* Sheppard's home. Consequently, Sheppard was not entitled to invoke the defense afforded by Kentucky's stand-your-ground statute.

Sheppard additionally claims that the testimony about the shooting came from individuals other than Johnny Hill himself and, therefore, must be considered inadmissible hearsay. However, the Federal Rules of Evidence, including the rules concerning the inadmissibility of hearsay testimony, do not apply to sentencing proceedings. *See* Fed. R. Evid. 1101(d)(3). The Guidelines also recognize the relaxation of ordinary evidentiary rules during sentencing hearings, providing that sentencing courts "may consider relevant information without regard to its

admissibility under the rules of evidence applicable at trial." USSG § 6A1.3(a). *See also United States v. Paull*, 551 F.3d 516, 527 (6th Cir. 2009).

Even so, such hearsay testimony still must have "sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a); *United States v. Robinson*, 898 F.2d 1111, 1115 (6th Cir. 1990) ("The district court may consider hearsay evidence in determining sentence, but the accused must be given an opportunity to refute it, and the evidence must bear some minimal indicia of reliability in respect of defendant's right to due process."). Sheppard's own admissions provide the necessary indicia of reliability in this case. Indeed, although Sheppard insists that Johnny and Melvin Hill were attempting to rob him, he offers no evidence that either brother actually entered Sheppard's residence and, more damningly, "advised that he intended to shoot Johnny Hill in the buttocks, but missed, instead striking him in the back." Such an admission not only is incompatible with a stand-your-ground defense but also corroborates the testimony of law enforcement officers at the sentencing hearing that Sheppard intentionally shot an individual who was not attempting to enter Sheppard's residence. The district court thus did not abuse its discretion in applying a four-level increase to Sheppard's offense level for use of a firearm in the commission of an assault on Johnny Hill.

Furthermore, in challenging the substantive reasonableness of his sentence, Sheppard does not allege that the district court failed to consider the relevant sentencing factors set forth in 18 U.S.C. § 3553(a). Instead, he simply argues that his troubled upbringing, his acceptance of responsibility, and his desire to end his abuse of illegal drugs should have led the district court to impose a more lenient sentence within the relevant Guidelines range. However, because the district court did consider those factors, such an argument is insufficient to rebut the presumption

that Sheppard's within-Guidelines sentence was reasonable. *See Pearce*, 531 F.3d at 384. We thus find no merit to Sheppard's challenges to his sentence.

**Allegations of Error Raised by Defendant Petrey**

### Substantive Reasonableness of Petrey's Sentence

Although defendant Petrey was subject to a sentence in the advisory Guidelines range of 262 to 327 months, the government, in exchange for the assistance Petrey provided to prosecutors, suggested that the district court instead sentence him within the range of 158 to 197 months. Despite that recommendation, the district court departed downward four levels, arrived at a sentencing range of 168 to 210 months, and imposed a sentence of 200 months in prison. In doing so, the district court noted that, had the government so chosen, it could have charged Petrey such that he would have been subject to a mandatory life sentence.

Petrey first submits that the district court should have considered a greater downward departure than it did. However, "[w]here, as in this case, the district court grants a downward departure for substantial assistance and the defendant's claim on appeal goes only to the extent of the departure, this Court has no jurisdiction over the appeal." *United States v. Jones*, 417 F.3d 547, 551 (6th Cir. 2005). We thus cannot address this portion of Petrey's appellate challenge.

Petrey also claims that the 200-month sentence that was imposed upon him was substantively unreasonable because the district court failed to take into account the facts that he was convicted of a non-violent crime, that he cooperated with authorities, that his criminal acts were caused in large part by his drug dependency, and that the district court improperly relied upon the possibility that Petrey could have faced a life sentence. Those arguments are not

persuasive. The district court did take into account the assistance provided by Petrey when it reduced the applicable Guidelines range by four levels. Moreover, the sentencing court took into account Petrey's extensive, "troubling" criminal record, his personal history, and the recognition that, at some point in his life, the defendant must accept the blame for his failure to abide by duly enacted laws. The district court further noted that prior sentences imposed upon Petrey failed to deter him from criminal activity and that the court continued "to have concerns with issues of protecting the public once the defendant is released." The district court extensively discussed all relevant § 3553(a) factors before imposing a sentence that it felt took into consideration the nature and circumstances of the offense, the defendant's history and characteristics, and the need to reflect the seriousness of the offense, to promote respect for law, to provide just punishment and deterrence, to protect the public, and to avoid unwarranted sentencing disparities.

Petrey cannot rebut the presumption that the sentence within the sentencing range that was determined to be appropriate was reasonable. *See Pearce*, 531 F.3d at 384. Consequently, his challenge also is without merit.

## CONCLUSION

The defendants have not been able to point us to any reversible error committed by the district court in this matter. As a result, we AFFIRM the judgments entered against all three of them.