NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0072n.06

Nos. 15-5723/5852

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jan 26, 2017 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| RICHARD MEADE and MARK JUSTICE, | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE:   DAUGHTREY, CLAY, and COOK, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   The convictions in this case arose from the disguise and resale of stolen motorcycles.  A jury found the defendants, Richard Meade and Mark Justice, guilty of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); concealing the proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and possessing vehicle parts with altered vehicle identification numbers (VINs), in violation of 18 U.S.C. § 2321.  The defendants appeal, alleging principally that the indictment was invalid and that the district court made various errors in the admission and exclusion of evidence and in the jury instructions.  We find no reversible error and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2011, federal prosecutors charged the defendants and eight others with conspiring to commit money laundering.  They also charged Meade and Justice with "concealment money

laundering" and with receiving vehicle parts with altered VINs. The basic facts of the money-laundering conspiracy are as follows: Greg Chapman and Jason Chapman stole motorcycles from South Dakota, South Carolina, and Florida, and transported them to Kentucky. These men and various co-conspirators then worked to hide the fact that the motorcycles were stolen by finding ways to conceal the VINs and other identifying information. In order to do this, the Chapmans and their crew would remove the VINs or replace the parts of the motorcycles that contained identifying information with new or salvaged parts. The purpose of replacing all of the parts that included identifying information was so the motorcycles could be retitled and resold.

The Chapmans sold motorcycles to Hertz Car Sales, run by defendant Meade. Meade then resold and transferred title on these motorcycles. The Chapmans also sold motorcycles to Midland Motors. Defendant Justice did not own Midland Motors, but the owners of Midland Motors stored motorcycles on Justice's property, Justice was involved in approving the sales of motorcycles, and Justice left envelopes of cash at Midland Motors to pay the Chapmans for the motorcycles they delivered.

During its investigation, the government relied on several types of information to identify the stolen motorcycles. If the VIN was not apparent, the investigators looked for confidential markings located on the motorcycles. This confidential information included "secondary numbers" and "paint codes." A secondary number is a unique number located on an undisclosed part of the motorcycle, for the purpose of identifying the motorcycle in situations, as here, where the original VIN is no longer intact. A paint code is a different number or marking, which can be used to identify the date that the motorcycle was manufactured. Harley Davidson maintains a database with information for all of the motorcycles it manufactures, and once the investigators

found secondary numbers or paint codes, they used that database to identify the original VIN. From there, the investigators searched to see if police reports had been filed for a motorcycle with that VIN.

Prior to trial, seven of the co-conspirators entered guilty pleas to various charges, but these two defendants (and one other co-conspirator, George Ferguson) went to trial. A central issue leading up to the trial was whether or not information regarding the secondary numbers and paint codes, referred to throughout the record as "confidential manufacturer identification information," had to be disclosed to the defendants. Based on a case summary prepared by one of the government experts, Detective Riley, the defendants moved for supplemental discovery of this information, which the government resisted. The district court granted the defendants' discovery request, afterwards explaining that the court understood that Riley's case summary "defin[ed] the information sought" by the defendants in their discovery request, a characterization to which the defendants did not object. One category of information that the court directed the government to produce was "the files and records of Harley-Davidson." As explained by the district court, "instead of all the 'files and records' of the manufacturers that might somehow relate to the confidential vehicle identification . . . only those that fell within the Court's specific definition as tied to the Riley Affidavit were required to be produced."

At the close of the proof at trial, the jury found both defendants guilty of the money-laundering conspiracy (Count 1), Meade guilty of two counts of concealment money laundering (Counts 3 and 7), and Justice guilty of one count of concealment money laundering (Count 5). Each defendant was also found guilty of one count of possessing or receiving vehicle parts with an altered VIN. Meade was sentenced to 24 months in prison, and Justice was sentenced to 18 months.

**DISCUSSION**

**Sufficiency of the Indictment**

We review the sufficiency of an indictment *de novo*. *United States v. Olive*, 804 F.3d 747, 752 (6th Cir. 2015). An indictment "must set out all of the elements of the charge[d] offense" and "must be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts." *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005) (citation omitted) However, if a defendant does not challenge the indictment until after his or her conviction, which is the case here, the indictment must be "construed liberally in favor of its sufficiency," *Olive*, 804 F.3d at 752 (citation omitted), and "unless the defendant can show prejudice, a conviction will not be reversed where the indictment is challenged only after conviction unless the indictment cannot within reason be construed to charge a crime." *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999) (quoting *United States v. Hart*, 640 F.2d 856, 857-58 (6th Cir. 1981)).

Specified Unlawful Activity

The defendants argue that the substantive money laundering counts in the indictment were insufficient because the government did not allege that the properties involved in the financial transactions were the proceeds of a "specified unlawful activity." To be guilty of concealment money laundering, a defendant must have conducted a financial transaction involving proceeds of a specified unlawful activity. 18 U.S.C. § 1956(a)(1)(B)(i). Specified unlawful activity includes "any act or activity constituting an offense listed in [18 U.S.C.] section 1961(1)." 18 U.S.C. § 1956(c)(7)(A). Therefore, in order to prove that the property involved in a financial transaction constituted proceeds of a specified unlawful activity, the

government must allege and prove that the property was the proceeds of one of the predicate offenses listed in § 1961(1).

The indictment clearly stated that the property involved in the financial transaction "was the proceeds of a specified unlawful activity, that is, the interstate shipment of stolen vehicles." This language refers to the criminal offense of transporting stolen vehicles under 18 U.S.C. § 2312, which is a qualifying predicate offenses under § 1961(1). The defendants argue, however, that § 2312 criminalizes only the interstate transportation of vehicles that are *known* to be stolen, and because the indictment alleges that the specified unlawful activity was "the interstate shipment of stolen vehicles," it fails to allege a specified unlawful activity.

Although not stated explicitly in the briefing, the defendants seem to imply that the government was required to allege each element of the predicate offense in order to allege sufficiently each element of § 1956(a)(1)(B)(i); however, they cite no authority for this proposition, and our precedent indicates that the failure to allege all elements of a predicate offense does not undermine the sufficiency of the indictment, as long as the indictment properly gives the defendant notice of the charges and enough information to protect against double jeopardy. *See, e.g. United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (finding that an indictment need not specify the predicate drug-trafficking offense when charging a defendant with using a firearm during the commission of a drug-trafficking offense under 18 U.S.C. § 924(c)(1)); *United States v. Paulino*, 935 F.2d 739, 750 (6th Cir. 1991) ("Moreover, although Count III does not list specific predicate acts, it states the time frame in which the acts occurred, which would satisfy any double jeopardy concerns.").

The indictment not only alleged each element of the offense intended to be charged— concealment money laundering—but also protected the defendants against double jeopardy by

informing them of the timeframe during which the criminal acts were alleged to have taken place and identifying the criminal act underlying the claim as the interstate transport of stolen motorcycles. The indictment can be read to allege a crime, especially when liberally construed, and because the defendants have not specified how the failure to allege each element of the predicate offense caused them prejudice, reversal is not warranted.

In their reply brief, the defendants also argue that the indictment further failed to state an offense because the defendants did not participate in the specified unlawful activity listed in the indictment. However, "[a]n argument raised for the first time in a reply brief will not be considered by this Court." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Additionally, this argument is completely without merit based on the clear language of the statute. Although 18 U.S.C. § 1956(a)(1)(B)(i) does rely on the occurrence of a predicate offense, the charged party need not have been responsible or involved in the offense – they simply had to conduct a financial transaction "*knowing* that the property involved in [the] financial transaction represents the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1) (emphasis added).

Proceeds of the Specified Unlawful Activity

Next, the defendants take issue with the specific type of proceeds identified by the indictment. As explained above, one element of the crime of concealment money laundering is that the financial transaction at issue involved the proceeds of a specified unlawful activity. The indictment specified that, in this case, the proceeds were stolen motorcycles, which the defendants now argue are not the type of "proceeds" referred to in § 1956(a).

The defendants are wide of the mark in making this argument. They are "not so much contending that the indictment fails to state an offense, but rather that [they] could not be guilty

under the statute" because motorcycles are not proceeds. *United States v. Anderson*, 605 F.3d 404, 412 (6th Cir. 2010). The defendants were free to make this argument at trial, but the government was also free to charge in the indictment that motorcycles *do* constitute proceeds for purposes of the statute, and then to prove this point at trial. "The indictment need only set forth elements that, if proven, constitute a violation of the relevant statute." *Id.* In addition, the defendants' arguments as to why motorcycles cannot be proceeds under § 1956 are without merit. They contend, for example, that "proceeds" refers only to monetary instruments or funds, and that personal property, such as motorcycles, are not proceeds. The defendants do not cite case law supporting this proposition, and although the majority of money-laundering cases do involve proceeds such as cash or monetary instruments, the defendants' interpretation is at odds with the clear language of the statute.

First, whereas § 1956(a)(1) criminalizes certain transactions involving "proceeds of specified unlawful activity," § 1956(a)(2) criminalizes transactions specifically involving "monetary instrument or funds." 18 U.S.C. § 1956(a)(1)-(2). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation and brackets omitted). Second, § 1956(b) provides that anyone who conducts a transaction described in § 1956(a) could be liable to the United States for a civil penalty equal to "the value of the property, funds, or monetary instruments involved in the transaction," which indicates that § 1956(a) was intended to criminalize not only transactions involving funds and monetary instruments but also other types of proceeds. 18 U.S.C. § 1956(b)(1)(A). Third, Congress defined the term "financial transactions" as transactions that (1) involve the movement of funds by wire or other means;

(2) involve one or more monetary instruments, or (3) involve the transfer of title to any real property, vehicle, vessel, or aircraft. 18 U.S.C. § 1956(c)(4). If the term "proceeds" in § 1956(a) was meant to refer only to monetary instruments or funds, the third type of financial transaction defined in the statute would be superfluous. The best interpretation of this statute is that "proceeds," as used in § 1956(a), is not limited to monetary instruments and funds, but includes all property obtained through unlawful activity.

Alternately, the defendants argue that after the Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008), "proceeds" is to be defined as the *profits* from the specified unlawful activity. This argument reflects a misunderstanding of our application of *Santos* in this circuit.

We have interpreted *Santos* to hold that "proceeds" means "profits" only when "the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase." *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009). A "merger problem" occurs when nearly every violation of the predicate offense would also be a violation of the money-laundering statute. *Olive*, 804 F.3d at 756-757. Using the situation in *Santos* as an example, "if 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." *Id.*

When determining whether "proceeds" should be defined as "profits," we engage in a three part inquiry: (1) is there a merger problem? (2) does this problem lead to a radical increase in the statutory maximum sentence? and (3) does the legislative history fail to show that

Congress intended the increase? *Jamieson v. United States*, 692 F.3d 435, 440 (6th Cir. 2012). "Proceeds" is defined to mean "profits" only when all three questions can be answered affirmatively. *Id.* The predicate offense in this case, 18 U.S.C. § 2312, criminalizes "transport[ing] in interstate or foreign commerce a motor vehicle, vessel, or aircraft, knowing the same to have been stolen." Unlike the illegal-lottery statute, defining "proceeds" as gross receipts rather than profits would not result in a merger between § 2312 and the money-laundering statute. An individual can transport stolen motorcycles across state lines without ever engaging in money laundering—this result is true regardless of how "proceeds" is defined. Because there is no merger issue in this case, the district court was not required to interpret "proceeds" to mean "profits."

Conspiracy Count

The defendants argue that Count One of the indictment, which charges the defendants with conspiracy to commit money laundering under § 1956(h), is insufficient because it "misstat[es] and selectively incorporate[s] elements from two different statutes, neither of which would have applied on their own." Count One alleges that the defendants:

> [C]onspire[d] together and with others to knowingly conduct and engage in financial transactions in criminally derived property, affecting interstate and foreign commerce, which, as known by the defendants, involved the proceeds of a specified unlawful activity, that is, interstate shipment of stolen vehicles, knowing the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), all in violation of 18 U.S.C. § 1956(h).

The defendants' argument centers on one phrase included in the indictment: "criminally derived property." This phrase is present in § 1957, not § 1956, but the government included it—admittedly, in error—when describing the money laundering provision that the defendants allegedly violated. The defendants argue that by including this phrase, the government failed to

allege that the defendants agreed to commit the crime of money laundering; instead, they say, the government hybridized § 1956 and § 1957 and alleged that the defendants agreed to commit a "non-existent offense."

The defendants appear to believe, mistakenly, that an indictment charging § 1956(h) must not only allege that the defendants agreed to violate the money-laundering statute but must also allege each element of the specific money-laundering crime at issue. This position is unfounded, as "[i]t is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir.1985) (citing *Wong Tai v. United States*, 273 U.S. 77, 81 (1927). The indictment must allege that two or more people agreed to commit some form of money laundering, but the precise elements of the specific money-laundering crime are not required.

Moreover, in this case the government *does* allege each element of the specific money-laundering crime at issue. The crime of concealment money laundering under § 1956(a)(1)(B)(i) has three elements: (1) that the defendant conducted a financial transaction that involved the proceeds of a specified unlawful activity, (2) that the defendant knew the property involved was proceeds of unlawful activity, and (3) that the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. 18 U.S.C. § 1956(a)(1)(B)(i). The indictment alleges that the defendants conspired to "*conduct and engage in financial transactions* in criminally derived property, affecting interstate and foreign commerce, *which, as known by the defendants, involved the proceeds of a specified unlawful activity*," satisfying each of the first

two elements, and that the defendants knew that "the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity," satisfying the third element. The indictment can be construed to charge a crime, as it alleges not only the elements of the conspiracy offense, but also the underlying money-laundering crime.

To succeed in this claim, the defendants must therefore show that inclusion of the phrase "criminally derived property" in the indictment somehow prejudiced them. The government argues that this phrase may be ignored as surplusage, but of course not all surplus language is harmless and non-prejudicial. *See Payne v. Janasz*, 711 F.2d 1305, 1312 (6th Cir. 1983). "[A]n analysis of surplus words in an indictment is necessarily a nebulous task which requires us to speculate as to the effect of semantic irregularities on the trial process." *Id.*

Here, the indictment alleged that the defendants knew that the property at issue constituted the "proceeds of a specified unlawful activity" and also that the defendants knew that the property was "criminally derived property," defined by 18 U.S.C. § 1957 as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). The defendants do not explain why alleging that the defendants knew the property was the proceeds of specified unlawful activity, as well as criminally derived property, was prejudicial. Based on the definition of the terms, the "proceeds of specified unlawful activity" likely qualify as "criminally derived property" in the majority of cases. This phrase was not included in the jury instructions, and because the phrase "did not change the nature of the offense charged or obscure the other language of the indictment," the government correctly asserts that it can be ignored as surplusage. *Payne*, 711 F.2d at 1313.

<u>Jurisdiction of District Court</u>

The defendants argue that because the indictment was insufficient, the district court did not have jurisdiction over these claims. But, as explained above, their arguments about why the indictment was insufficient are without merit. In addition, defects in an indictment do not deprive a court of jurisdiction to adjudicate a case. *United States v. Cotton*, 535 U.S. 625, 630-31 (2002).

**Admission of Police Reports**

Next, the defendants contend that the district court violated their rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution by admitting police reports into evidence. Generally, we review the district court's evidentiary rulings for abuse of discretion, but challenges made under the Confrontation Clause are reviewed *de novo*. *United States v. Warman*, 578 F.3d 320, 345 (6th Cir. 2009). "The Confrontation Clause bars the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 345-46 (internal quotation marks and citation omitted). To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature and must be hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007) (citing Fed. R. Evid. 801(c)). The government introduced police reports into evidence at trial that memorialized statements by the original owners of the motorcycles who reported their motorcycles stolen. The defendants argue that those statements were testimonial hearsay evidence and, therefore, that their admission was a violation of the Confrontation Clause.

A statement is testimonial if "a reasonable person would anticipate that his or her statement would later be used against the accused in investigating and prosecuting the crime." *Warman*, 578 F.3d at 346 (internal quotation marks and citation omitted). Under this standard, the police reports at issue are undoubtedly testimonial, and the reports could not be offered by the government to "prove the truth of the matter asserted"—or, in other words, to prove that the bikes were in fact stolen—absent an opportunity for the defendants to cross-examine the individual who prepared the reports. However, the admission of a testimonial statement "does not necessarily trigger a violation of the Confrontation Clause." *Gibbs*, 506 F.3d at 486. "In some circumstances, out of court statements offered for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay." *Id.* (citing *United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990)). "[E]vidence that is provided merely by way of background or is offered only to explain how certain events came to pass or why the officers took the actions they did, is not offered for the truth of the matter asserted." *Warman*, 578 F.3d at 346 (internal quotation marks and citation omitted). Hence, statements offered to "establish[] a foundation for the evidence," rather than as proof that the crime was committed, do not violate the Confrontation Clause. *United States v. Davis*, 577 F.3d 660, 667 (6th Cir. 2009).

In this case, the police reports were offered to support Detective Riley's testimony, by which he explained that he and his team identified potentially stolen motorcycles based on suspicious title and registration documents. To determine the origin of the motorcycles, Riley would run a search using data from the National Crime Information Center and, if he got "a hit," he would call the police agency that filed the police report and request a copy of it. Using the information on the report, Riley could locate the individual who reported the bike stolen and

determine whether the bike found in Kentucky matched the description of the lost bike.  When admitted for this purpose, the police reports were not introduced as proof that the motorcycles were stolen; rather, as the government explained, the reports were offered to "corroborate the officer's investigation . . . and reconstruct his investigative chain."  Thus, the district court did not err in allowing the police reports into evidence for the purpose of detailing the investigation of the stolen motorcycles.

**Admission of Expert Testimony**

The defendants argue that the district court erred in allowing three government witnesses to testify as experts.  "We apply the abuse-of-discretion standard in reviewing a district court's decision regarding the admissibility of expert testimony."  *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009).  "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence."  *Id.* (citing *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005)).

After a three-day *Daubert* hearing,[1] the district court issued an order qualifying three government witnesses as experts on "the techniques utilized to complicate and obscure motorcycle and motorcycle part identification" and "the methods used to uncover their true identity."  The defendants argue that this qualification was in error because the methodology employed by the witnesses in identifying motorcycles relied on confidential manufacturer information that had not been disclosed to the district court or the defendants.  Thus, the defendants argue, the district court was not able to analyze thoroughly the reliability of the methodology, and the defendants themselves were unable to call other expert witnesses to dispute the reliability of the methodology at issue.

---

[1] In *Daubert v. Merrell Dow Pharm. Inc*., 509 U.S. 579 (1993), the Supreme Court held that the Federal Rules of Evidence require the trial court judge to ensure that an expert's testimony is both reliable and relevant before it may be admitted.

In its order qualifying the three witnesses as experts, the district court summarized the lengthy qualifications of each expert and found that under the *Daubert* standard, their methodology was both reliable and relevant. The district court also touched on the defendants' concern regarding the confidential manufacturer identification information, stating that access to the confidential information at this point was not a "true cause for concern." The order explained that the reliability of the defendants' methodology was not based solely on their knowledge of confidential information, but rather on their years of experience in vehicle identification and, further, that the confidentiality of the secondary numbers bolstered their ability to identify motorcycles reliably. *United States v. Chapman*, No. 11-51-GFVT, 2012 WL 6020105 (E.D. Ky. Dec. 3, 2012)

A trial court must have latitude in deciding whether an expert's testimony is reliable and in how to test that reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, (1999). In this case, the district court spent three days listening to the qualifications of each expert, learning about their experience in the field, and hearing them defend their methodologies for vehicle identification. At the beginning of the first day of the hearing, the defendants and their co-defendants raised the issue of the confidential manufacturer information to the district judge, who agreed to consider those concerns when determining the reliability of the evidence. Based on all of the information supplied, which included lengthy discussion of vehicle identification techniques that did not rely on any confidential information, as well as testimony about the general role of the confidential manufacturer information in vehicle identification, the district court found the testimony to be admissible as expert testimony. Moreover, the district court reminded the defendants that they were permitted to cross-examine the government's experts and to present their own experts at trial. Despite the defendants' challenges, there is no

evidence that the district court abused its discretion in qualifying the three government witnesses as experts.

Relatedly, the defendants argue that at trial one of the government's experts, Detective Riley, exceeded the scope of his expertise. They contend that despite the district court's finding that Riley was a "non-scientific" expert, he offered scientific testimony about "the quality of the sheet metal upon which he conducted an acid test to attempt to locate an obscured VIN on Motorcycle 43." But because the defendants failed to object to this testimony during trial, review on appeal is for plain error only. *See* Fed. R. Evid. 103(a); Fed. R. Crim. P. 52(b).

To obtain relief under the deferential plain-error standard of review, "the party challenging the evidentiary ruling must show that (1) there was an error that (2) was plain, (3) affected a substantial right, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012). Here, the district court qualified Riley to testify on "techniques utilized to complicate and obscure motorcycle and motorcycle part identification," which is exactly what Riley was doing in describing the sheet metal. Riley did not attempt to explain the chemical composition of the metal or the acid; he simply recounted his observations of a test used to identify vehicles. This testimony thus falls within the scope of expertise acknowledged by the district court, and no plain error resulted.

The defendants also challenge the admission of testimony regarding the confidential manufacturer identification information on constitutional grounds. Because this specific information was not disclosed to them, the defendants argue that this evidentiary decision violated their right to confrontation under the Sixth Amendment. The defendants argue that by not requiring the government experts to testify about the location of the confidential markings on

each motorcycle, the district court effectively prevented the defendants from confronting the witnesses against them.

"The applicable standard of review for an evidentiary ruling of the district court where the evidentiary issues relate to a claimed violation of the Sixth Amendment is the *de novo* standard." *United States v. Adams*, 722 F.3d 788, 829 (6th Cir. 2013) (citation omitted). The government experts declined to identify the exact location of the secondary numbers, and the defendants argue that this refusal prevented them from establishing "that those charged should not be held accountable for their involvement with stolen motorcycles because they could not be expected to identify confidential markings confirming that the bike was stolen," and from disputing "the accuracy of law enforcement's conclusions that a particular bike or component was stolen." It is not clear why the defendants believe they were prevented from making these arguments. The government experts provided substantial testimony related to these numbers, such as which parts of the motorcycles contained the identifiers and which did not and how the confidential identifiers were used to identify particular motorcycles. The defendants were free to find holes in the experts' testimony, undermine their credibility, and establish doubt in the minds of the jurors. Moreover, as conceded at oral argument, the defense in this case was not that the motorcycles were not stolen, but that the defendants did not know that they were stolen. As a result, it is unclear what additional arguments the defendants would have made had they known the exact location of the numbers on the motorcycles. Because the defendants did have the opportunity to confront effectively the government witnesses who testified against them, the district court did not err in allowing the witnesses to testify about the confidential numbers.

**Disclosure of Manuals**

The defendants next argue that the government's failure to disclose confidential manufacturer identification information violated the defendants' right to due process, citing both

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure, as well as *Brady v. Maryland*, 373 U.S. 83 (1963). We review a district court's rulings on Rule 16(a)(1)(E) issues for abuse of discretion. *United States v. Tarwater*, 308 F.3d 494, 515 (6th Cir. 2002). "We review *de novo* the issue of whether evidence withheld by the prosecution constitutes *Brady* material." *Id.*

As explained above, prior to trial, the defendants moved for supplemental discovery of certain confidential information related to the government's methodology for identifying the stolen motorcycles. The district court granted the motion, explained that the defendants were seeking "confidential manufacturer identification information," and defined the scope of what the court understood the defendants to be requesting. Critically, the district court determined that the defendants sought information that was used by investigators to identify the stolen motorcycles at issue in this case. The defendants did not object to the district court's characterization of their request.

During the *Daubert* hearing, Simet, a Harley Davidson employee and expert witness for the government, detailed his expertise in vehicle identification and mentioned that he had published a manual of vehicle identification techniques and trained various law enforcement agencies on the information included in these manuals. The district court determined that these manuals were not subject to the supplemental discovery order after finding that they had not been relied on during the investigation at issue. The defendants now contend that the district court erred by not requiring the government to provide these manuals to the defendants.

Brady Violation

The defendants do not argue that the manuals contain exculpatory information that the government willfully or inadvertently withheld from them; rather, they insist that failure to gain access to these manuals prevented them from finding an expert who potentially could identify

exculpatory information related to the methodology employed by the government in identifying the motorcycles.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "A *Brady* violation includes three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008) (internal quotation marks and citation omitted). At this point, the defendants have not identified any exculpatory evidence that was withheld, either willfully or inadvertently. Consequently, no *Brady* violation has occurred.

Federal Rule of Criminal Procedure 16

The defendants also argue that Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure required the government to disclose the manuals. The rule states:

> Upon a defendant' s request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

Based on the language of this rule, at first glance it does seem that the manuals—which contain general information about how law enforcement goes about identifying stolen motorcycles—arguably could be useful in preparing a defense. However, the rule clearly

provides that the defendants must *request* this information from the government, and because the government had not relied on the manuals during the investigation, the district court appropriately determined that the manuals were beyond the scope of the discovery order.

The defendants do not argue that the district court's summary of the information requested in their supplemental discovery motions was incorrect or overly narrow. Instead, the defendants argue that the manuals indeed did fall within the information that the district court ordered the government to disclose and that the court's contrary finding was erroneous "because it incorrectly distinguished between the materials in Harley Davidson's possession and the manuals testified to by government experts as containing the same information." However, the district court found that the "materials in Harley Davidson's possession" subject to the discovery order were limited to the information in the company's database, and there is no support for the defendants' conclusory statement that the manuals were discoverable because they were "copies" of the identification information stored in the database. The minimal amount of testimony related to the manuals indicates that that they contained general vehicle identification information meant to assist law enforcement with vehicle recovery, not specific identification information for each manufactured Harley Davidson motorcycle.

The district court did not abuse its discretion in defining the scope of the defendants' motion for supplemental discovery or in finding that the manuals were not included within the scope of that request. This allegation of error is thus without merit.

**Exclusion of Witness Testimony**

Defendant Meade alone contends that the district court abused its discretion in excluding the testimony of co-conspirator Jason Chapman, who had already pleaded guilty to conspiracy to commit money laundering. Outside the presence of the jury, counsel for the defense asked

Chapman if Meade knew that the motorcycles at issue were stolen, and Chapman responded, "No, he did not." The government then attempted to ask Chapman several follow-up questions, such as how many motorcycles Chapman stole, where he brought the stolen motorcycles, and whether he faked or forged documents in titling the motorcycles that he took to the defendants. Chapman invoked his Fifth Amendment right against self-incrimination and declined to answer each of the questions asked by the government. Based on Chapman's refusal to respond to any of the government's questions, the district court excluded his testimony from the trial.

A district court's decision to exclude evidence is reviewed for abuse of discretion. *United States v. Baldwin*, 418 F.3d 575, 579 (6th Cir. 2005). Under that standard, we will reverse an evidentiary ruling only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error, such as a district court reliance on incorrect findings of fact or improperly applied the law. *See id.* In deciding whether to exclude Mr. Chapman's testimony, the district court relied heavily on an unpublished opinion from this court, *United States v. Coleman*, 453 F. App'x 640 (6th Cir. 2011). In *Coleman*, we held that it was not an abuse of discretion for a district court to exclude testimony from a prospective witness for the defense when the witness invoked her Fifth Amendment right against self-incrimination during the prosecution's cross-examination. *Id.* at 644. We explained that "one of the legitimate demands of the adversary system is the right of cross-examination" and found that the district court was within its discretion to exclude witness testimony because "its admission would unduly prejudice the prosecution." *Id.* The district court read from the *Coleman* decision, explained that "the government has to be able to test that assertion and the credibility of the witness with regard to that particular statement," and concluded that it would not "allow the

defense to call Mr. Chapman who is going to refuse to answer any questions posed on cross-examination."

Although Chapman's testimony is undeniably relevant to the issue at hand, Rule 403 of the Federal Rules of Evidence allows the district court to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice or of misleading the jury. *See* Fed. R. Evid. 403. Although the probative value of Chapman's statement is potentially strong, the admission of this kind of statement without any cross-examination to help the jury determine the strength of the statement and the credibility of the witness has a great risk of misleading the jury and unfairly prejudicing the prosecution. "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005) (internal quotation marks and citation omitted). We find no abuse of discretion in the district court's ruling on this matter.

**Sufficiency of Evidence for Count 5**

A heading in the defendants' brief states that a "lack of federal jurisdiction barred Mr. Justice's prosecution for counts 1 and 5 and Mr. Meade's in counts 1, 3, 7, and 8," but the body of the argument discusses only the perceived jurisdictional problem for Count 5 against Justice.[2] The text contains no reference to the other counts, no explanation of why jurisdiction did not exist as to the other counts, and no argument as to the sufficiency of the evidence for those counts. "[I]ssues adverted to in a perfunctory matter, unaccompanied by some effort at

---

[2] Although the argument concerning Count 5 applied only to the charge against Justice, the analysis of the claim actually appeared only in the appellate brief filed by Meade and is not mentioned in Justice's brief. However, the latter brief does include a statement that Justice "joins" in Meade's brief and "adopts the arguments presented" in that brief.

developed argumentation, are deemed waived." *United States v. Layne*, 192 F.3d. 556, 566 (6th Cir. 1999)) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997)).

As to Count 5 against Justice, the defendants argue that the district court should have dismissed the charge for lack of jurisdiction because the government did not prove that the financial transaction at issue had an effect on interstate commerce, as required by the statute. However, we have specifically explained that an interstate commerce element, although often referred to as a "jurisdictional element," is "not jurisdictional in a sense that it deprives the district court of subject matter jurisdiction." *United States v. Turner*, 272 F.3d 380, 390 (6th Cir. 2001) (finding that the failure to prove nexus between the crime and interstate commerce did not strip the federal court's jurisdiction); *see also United States v. Rayborn*, 312 F.3d 229, 231 (6th Cir. 2002). The defendants' interstate-commerce argument is better characterized as an argument against the sufficiency of the evidence, and we review it as such.

To preserve properly a sufficiency-of-the-evidence issue for appeal, "the defense must make a motion for a judgment of acquittal at the end of the prosecution's case-in-chief and at the close of evidence." *United States v. Sease*, 659 F.3d 519, 522 (6th Cir. 2011) (internal quotation marks and citation omitted). The defendants properly moved for judgment of acquittal as to Count 5. Specificity is not required, but "where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived." *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002). The defendants' motions for judgment of acquittal raised sufficiency-of-evidence concerns and specified certain elements that had not been sufficiently proven, but they made no argument about the interstate commerce element.

The standard of review for a properly preserved challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime." *Kuehne*, 547 F.3d at 696 (internal quotation marks and citation omitted). If the challenge was not properly preserved, as here, the challenge "is reviewed under a manifest miscarriage of justice standard." *Id.* Under either standard, the defendants' argument fails.

The defendants argue that Justice's convictions were based on the title transfer of a motorcycle, identified as Motorcycle #43 throughout the trial, and that the government failed to prove that the transaction involving that motorcycle had any effect on interstate commerce. However, as the government points out, Count 5 was actually based on Motorcycle #19, a 1997 Harley Davidson black and grey Heritage Softail, not Motorcycle #43. The government presented sufficient evidence to support a finding that the titling transaction of Motorcycle 19 had at least a *de minimus* effect on interstate commerce: the bike was stolen in Florida, transported to Kentucky, reassembled with parts from a company in California, and retitled in Kentucky. Given this proof, there is no manifest miscarriage of justice, and the evidence is sufficient for a rational trier of fact to have found that the transaction affected interstate commerce. The sufficiency-of-the-evidence challenge is thus without merit.

**Propriety of Jury Instructions**

The defendants argue that the district court made three errors when instructing the jury by failing to include a good-faith instruction, by included a deliberate-indifference instruction, and by incorrectly defining the term "proceeds." To preserve a challenge to a jury instruction, a party "must inform the court of the specific objection and the grounds for the objection"; absent plain error, the failure to make such an objection precludes appellate review. Fed. R. Crim. P. 30(d). Of the errors alleged here, only the first was properly preserved.

The defendants waived their challenge to the deliberate-indifference instruction by inducing the error of which they now complain. They specifically proposed that pattern jury instruction 2.09, the deliberate-indifference instruction, be included in the jury instructions. "According to the invited error doctrine, when a party has himself provoked the court to commit an error, that party may not complain of the error on appeal unless that error would result in manifest injustice." *United States v. Demmler*, 655 F.3d 451, 458 (6th Cir. 2011) (applying the invited-error doctrine to a challenged jury instruction). Because instructing the jury on deliberate indifference did not result in "manifest injustice," we decline to review the challenge to the deliberate-indifference instruction.

Because the defendants failed to object to the definition of "proceeds" at trial, we may review the claim on appeal for plain error only. The defendants appear to argue that the definition of "proceeds" was incorrect because it did not consider the *Santos* decision, under which "proceeds" are at times defined as profits. But, as we explained above, *Santos* is inapplicable in this case, and there is no error, plain or otherwise, in the definition of "proceeds" used in the jury instructions.

The defendants did preserve their challenge to the denial of a good-faith jury instruction, which we review for an abuse of discretion. *United States v. Theunick,* 651 F.3d 578, 589 (6th Cir. 2011). We may reverse the denial of a good-faith instruction "only if the proposed instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Volkman*, 797 F.3d 377, 385 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 348 (2015) (internal quotation marks and citation omitted). Generally, a good-faith instruction is appropriate when fraud or other specific-intent

crimes are being charged, because a finding of good faith is incompatible with a required finding of bad faith. *See United States v. Wall*, 130 F.3d 739, 746 (6th Cir. 1997) ("Since mail fraud is a specific intent crime . . . , good faith is a complete defense to that crime.")

Here, however, the defendants are not charged with a specific-intent crime. They are charged with conducting a financial transaction, *knowing* that the property involved in the transaction was the proceeds of unlawful activity, and *knowing* that the transaction was designed to conceal or disguise that property. The defendants do not offer any authority for why a good-faith defense is appropriate in this situation. Further, because the jury instructions adequately informed the jury of the *mens rea* element actually at issue, an additional instruction on good faith was unnecessary and likely would have resulted confusion if it had been given. Because the defendants have failed to demonstrate that a good faith instruction was appropriate in this case, and because the instruction was substantially covered by the charge given to the jury, the district court did not err in declining to give a good-faith instruction to the jury.

**Juror Bias**

During the trial, the district judge notified counsel that one of the jurors had mentioned feeling uncomfortable due to being "stared down" by Justice and that this statement had been "kind of confirmed by other jurors." Additionally, more than one juror reported to a court security officer that they felt uncomfortable walking to their cars at night because the defendants parked their cars near where the jurors parked. However, no juror reported any attempted or actual communication or physical contact or intimated that his or her impartiality was compromised. Nevertheless, the defendants moved for a mistrial. The district court denied the motion and issued a memorandum explaining why the situation did not merit a mistrial or even a *Remmer* hearing. On appeal, the defendants argue that the district court erred by "not conducting

a *Remmer* hearing or permitting any additional investigation or presentation of evidence . . . on the issue of juror bias."

In *Remmer v. United States*, the Supreme Court explained that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial," and that if such contact or tampering is suspected, the trial court should "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." 347 U.S. 227, 230-231 (1954). However, "not all communications with jurors warrant a hearing for a determination of potential bias" and trial courts are generally required to conduct *Remmer* hearings "only in cases involving claims of intentional improper contacts or contacts that had an obvious potential for improperly influencing the jury." *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997) (internal quotation marks and citation omitted). We review the district court's decision not to hold a hearing for abuse of discretion. *See id.*

In explaining why a hearing was not necessary in this case, the district court first addressed the parking lot concerns. The district court found that no intentional contact had occurred and that "jurors' understandable preference for not seeing a defendant outside of court does not mean that when that preference goes unrealized, unfair influence follows. This sort of *de minimis* unintentional contact is well below the threshold at which a court should hold a hearing." In regard to the jurors' comments about being "stared down," the district court cited *United States v. Owens*, in which we held that a juror's perception that a defendant was staring at her did not constitute extraneous influence. 426 F.3d 800, 805 (6th Cir. 2005). In *Owens*, we noted that "[w]hen a defendant stares at a juror during the course of his trial . . . he has

introduced no outside contact with, nor special information about, a party or witness." *Id.* We noted that "[t]o hold otherwise . . . is to create incentives for a defendant to make his or her jury uncomfortable." *Id.* Based on these considerations, the district court decided that the circumstances presented in this matter did not warrant a *Remmer* hearing. Nothing in the district court's analysis constitutes an abuse of discretion.

**Restitution**

Defendant Justice challenges the district court's order that he provide restitution to the victims of the crimes. Under the Mandatory Victims Restitution Act (MVRA), restitution must be made for offenses against property in which an identifiable victim has suffered a pecuniary loss. 18 U.S.C. § 3663A(c)(1)(a). The MVRA defines "victim" as "a person directly and proximately harmed as the result of the commission of an offense for which restitution may be ordered," 18 U.S.C. § 3663A(a)(2), and "the legislative history of the MVRA makes clear that Congress did not intend to make defendants liable for losses they did not proximately cause." *United States v. Church*, 731 F.3d 530, 538 (6th Cir. 2013). Justice was convicted of money laundering and engaging in a conspiracy to money launder, and the government determined that these offenses were a direct and proximate cause of the harm resulting from the theft and laundering of 11 motorcycles. Based on the harm associated with these crimes, the government calculated that Justice owed $219,850.39 in restitution. Justice argues that this restitution amount is erroneous because only one of the 11 stolen motorcycles could be connected to his actions. We review the amount of a restitution award for abuse of discretion. *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009).

Justice contends that "[he] was involved with the titling of only one bike, Motorcycle 43," implying that he could be the "direct and proximate cause" of the harm caused to the

victims only if he was personally responsible for improperly titling the stolen motorcycles. The district court found, however, that the government appropriately attributed each of the 11 motorcycles to Justice. First, the district court concluded that Justice was clearly a direct and proximate cause of the harm to the owner of Motorcycle 19, based on the fact that his connection to the reassembly and falsified purchase order for Motorcycle 19 had been extensively litigated at trial. Moreover, the remaining nine motorcycles were properly attributed to Justice because Midland Motors had titled those motorcycles, and Justice was connected to Midland Motors. Even though Justice argued that his connection was too tenuous to support liability, the district court found "unmistakable evidence of Justice's direct involvement in the sale of the stolen bikes through Midland Motors" based on the following facts: Midland Motors was located in a garage on Justice's property, Justice attended a trade show as a representative of Midland Motors, and Justice was present when people bought motorcycles from Midland Motors. The district court found that Justice's testimony denying any connection to Midland Motors was "implausible" and "patently contradicted." Based on these findings, the district court acted within its discretion when it found that Justice, through his participation in Midland Motors, was a direct and proximate cause of the harm resulting from stolen motorcycles that were titled and resold by Midland Motors.

In imposing sentence upon Justice, the district court did not address specifically the ramifications of Justice's conspiracy conviction. Nevertheless, the government correctly points out that not only can Justice be held responsible for harm that he directly and proximately caused, but he also can be held responsible for harm that resulted from the money-laundering conspiracy. "[U]nder the MVRA, if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just

from specific conduct that met the overt act requirement of the conspiracy conviction." *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009) (internal quotation marks and citation omitted); *see also United States v. Bogart,* 576 F.3d 565, 576 (6th Cir. 2009).

For the first time on appeal, Justice challenges the government's plan to convert forfeiture funds to restitution in a process called "remission."  This argument is based on comments made by the government at the restitution hearing, in reference to the fact that many defendants entered plea deals for forfeiture amounts greater than the amount of restitution they were later calculated to owe.  As the government explains, remission is inapplicable to Justice because, unlike the defendants who entered plea deals, he is not subject to a forfeiture money judgment.  Therefore, this argument is without merit.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.